<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MISSOURI
 2                        SOUTHERN DIVISION

 3
        JUST ENTERPRISES, INC.,      )
 4                                   )
                        Plaintiff, )
 5                                   )
                        vs.          )  No. 06-CV-05023-JCE
 6                                   )  June 18, 2009
        (888)JUSTICE, INC.,          )
 7      JON L. NORINSBERG,           )
                                     )
 8                      Defendants. )  Springfield, Missouri

 9

10
                    PLAINTIFF'S CLOSING ARGUMENT
11          BEFORE MAGISTRATE JUDGE JAMES C. ENGLAND
                    UNITED STATES DISTRICT COURT
12
     APPEARANCES:
13   FOR THE PLAINTIFF:           MR. JEFFREY H. KASS
                                  GALLOP, JOHNSON & NEUMAN
14                                101 S. Hanley, 15th Floor
                                  St. Louis, MO  63105
15

16   FOR THE DEFENDANT:           MR. DOUGLAS M. WEEMS
                                  SPENCER FANE BRITT & BROWNE
17                                1000 Walnut St., Ste. 1400
                                  Kansas City, MO  64106-2140
18

19                                MR. JON L. NORINSBERG
                                  ATTORNEY AT LAW
20                                255 Broadway, Ste. 2700
                                  New York, NY  10007
21

22   COURT REPORTER:             MS. JEANNINE RANKIN,CSR,CCR,RPR
                                  U.S. COURT REPORTER
23                                222 N. Hammons Parkway
                                  Springfield, MO  65806
24

     Proceedings reported by stenography; transcript produced by
25   computer.
</pre>

1

1    JUST ENTERPRISES v. (888) JUSTICE, INC.

2    CASE NO. 06-CV-05023-JCE

3    JUNE 18, 2009

4    PLAINTIFF'S CLOSING ARGUMENTS

5    *   *   *   *   *   *

6    MR. KASS:  Thank you, Your Honor.  Some light

7    reading for this morning.

8        Well, I want to again thank you for the time you put

9    in this week.  And I promised you we'd be done Thursday, not

10   Friday, so -- I know this type of case is not always easy to

11   sit through, reading of depositions and talking about an area

12   of law that probably most of you have never discussed in your

13   life.  It can get very confusing.  Something that seems like

14   something happened on the stand, oh, that might be completely

15   unimportant or it could be very important, you guys would have

16   no way or really knowing.  So I appreciate you sitting through

17   this even though this isn't exactly going to be the topic of

18   romance novels or something.

19       You know, I watched some things on the Discovery

20   Channel with my daughter, Naomi, and we watch these -- I don't

21   know if you guys have ever seen the Discovery Channel but they

22   have these shows that are like extreme animals and they really

23   have all kinds -- they have animals you've never seen in your

24   life before that can do all kinds of neat things.  And,

25   actually, not long ago we're watching one of these shows and

2

1  something that I saw with her reminded me of this case.  It
2  was this animal in one of these shows that when it's being
3  attacked by a predator, what happens is the animal can change
4  all kind of colors back and forth, it can shoot liquid out of
5  its mouth, it can flap its wings, and the predator thinks,
6  "Oh, my God, me the predator, I'm the one who's in trouble
7  here, I'm the predator that's to be scared off."
8          Well, the truth is, the animal really has no
9  defenses.  The animal doesn't actually have an ability to
10  attack back at the predator.  If the predator wouldn't be
11  scared off, then the animal would be in trouble.
12          And that is -- this reminds me of this case because
13  most of this case has been a side show.  Most of this case has
14  been about issues that have nothing to do with this case.
15  You've read the instructions and we'll go through some of
16  these, but you've heard so much information in this case that
17  has nothing to do about the real, very narrow issues in this
18  case.
19          The defendants have tried to distract you in this
20  case.  They've tried to, you know, do a look-over-here
21  approach to this case.  And I have to commend them, they've
22  done a very good job.  They have been able to focus this case
23  on things that are not at issue.  I'll even give you some
24  examples here.
25          This case is not about whether everyone on the

3

1  planet has ever heard of 1-800-JUSTICE.  You've never heard me
2  get up in this courtroom -- I told you in my opening
3  statement, I think, there's no dispute over this.
4  1-800-JUSTICE, I never heard it before I was hired by my
5  client.  I don't know of anybody that's heard of it.  They can
6  quote from original lawsuits and all this stuff.  My client
7  did not come here to court to try to prove that 1-800-JUSTICE
8  is well known.  This is a color-changing event.  This is a
9  liquid-spraying event.  It has nothing to do with this case
10  even though they had an expert to come all the way down from
11  Chicago to tell you that it wasn't well known.

12        There was incredible amount of time up here on the
13  screen trying to prove or disprove how much is spent on
14  advertising.  Who cares?  It's not an issue in this case.
15  There's no requirement to spend $100,000 on advertising to
16  have a valid and enforceable trademark.  We've just gone
17  through the instructions but you didn't see anything about
18  that.

19        Then you heard probably an hour or two on this case
20  really getting honed in on whether -- when and if this mark
21  was used in the 1990s.  This is another one of those, who
22  cares?  This is an intent to use application.  You have to
23  understand something.  When somebody files a use application,
24  they've said that they've used the trademark and then they go
25  seven or eight years without using the trademark, so then

4

```
 1   you've got a problem.  This was an intent to use application
 2   and the Patent and Trademark Office didn't close the file when
 3   the FCC proceedings were going on and when Patients Plus came
 4   in.  They didn't do any of that.  The Patent and Trademark
 5   Office said, "Okay, let's wait until all that stuff is done,"
 6   and then registration came from that.
 7           The PTO did not reject its application knowing that
 8   this was filed in '92 and there was a use date filed at least
 9   as early as March 2003.  The Patent and Trademark Office
10   didn't say, "Well, gee, you filed this application in 1992 and
11   you're telling us your first use date is 2003, well, sorry, we
12   can't register it."  That's not what happened here.
13           And all these FCC items that were going on, the two
14   FCC proceedings and the Patients Plus trying to steal the
15   trademark at the Trademark Office, my client prevailed on
16   those issues.  This is a non-issue in this case.
17           And there's never been any dispute in this case that
18   my client has continually used the trademark 1-800-JUSTICE
19   since 2003 before Mr. Norinsberg ever even acquired the phone
20   number (888) JUSTICE in 2004.  To suggest that Just
21   Enterprises abandoned its trademark rights completely twists
22   the facts around in this case.
23           Remember in the beginning of jury instructions that
24   you heard at the beginning of the case -- and there was some
25   allusion to it today -- an intent to use application that
```

5

1   results in a federal registration means that the owner of the

2   trademark gets to go back from their first use date to the

3   time that the application was filed.  It gets in line before

4   anybody that didn't come before them.  And it makes sense.

5   Can you imagine if you could file an intent to use application

6   which puts -- it's a public record, puts the world on notice,

7   "Hey, I'm going to use 1-800-JUSTICE."  Then everybody can

8   look it up and say, "I really like that mark.  I think I'm

9   going to use it first."  It would be impossible to have that

10  kind of system.

11          Another distraction issue in this case was the

12  blocking of the phone number.  Again, we're talking about this

13  1990s period when there's an intent to use application

14  pending, when there's FCC proceedings pending, when there's

15  Patients Plus trying to steal the 1-800-JUSTICE trademark.

16  There's never been any blocking of this phone number after the

17  business got going in 2003 after the federal registration.

18  That's the period of time that is important in this case.  The

19  distraction, this flapping going on in the 1990s, they did a

20  great job showing, "Oh, you thought it was used in 1992, you

21  didn't think it was used in '92," and, you know, "One time you

22  said it was," that's just all a big distraction here.  This

23  registration happened in 2003.  This is another, who cares?

24          The fact is, there's never been any argument in this

25  case.  In fact, I remember when Mr. Norinsberg did his opening

6

statement, do you realize he did not say the phrase or the

        term (888) JUSTICE once in his opening statement?  That was

        the first time I said this case is going to be about

        distractions.  They don't want to talk about (888) JUSTICE.

        He wants to talk about the 1990s.

               There's no dispute in this case that my client not

        only began using 800-JUSTICE in at least as early as 2003 and

        had a registration in 2003, long before Mr. Norinsberg ever

        even purchased the phone number (888) JUSTICE.

               There was some detailed discussions going back and

        forth, you didn't use the circle R, you did use the circle R.

        This is only -- you can go through your instructions.  You

        don't have to take my word for it.  This is only relevant when

        somebody wants to recover damages from someone.  The person

        who you're trying to recover damages needs to be on notice in

        order to recover damages that they were doing something wrong.

        There's two ways, as you'll see in your instructions.  You can

        put a circle R and that puts the entire world on notice, or a

        person could have actual notice.  In other words, if you

        already know that the person has the trademark, you don't need

        to be told with a circle R that they have the trademark.

        Mr. Norinsberg stood up here in open court and told you that

        he knew about the trademark.  I mean, he called to try to

        maybe use it in New York even.  He knew about this trademark.

        The circle R, it's another distraction.

                                        7

1          And, in fact, I mean, the truth is, while the circle

2   R wasn't used all the time, I mean, obviously, you saw

3   sometimes it was used and sometimes it wasn't.  You don't need

4   to take either lawyer's word for that.  We've put it on the

5   board.

6          Now, this is a real important issue in this case --

7   I mean, it's a real important distraction that's been going on

8   here about does 800-JUSTICE, is that used as a trademark or

9   just a phone number and is it only licensed as a phone number.

10  There seems to be some confusion here.  Of course it's been

11  used as a phone number.  Nobody's suggesting in this case it's

12  used as a phone number.  It's not an either/or.  You can use

13  something as a phone number and you can also use it as a

14  trademark.  You saw Mr. Norinsberg's license agreement that he

15  does with his own licensees.  He says, "I'm licensing you the

16  phone number," and then you get down, "I'm also licensing you

17  the trademark."  When folks advertise this in -- in various

18  publications, you know, they sometimes advertise it as a phone

19  number and sometimes they advertise it as a trademark.  Right

20  here it's clearly advertised as a trademark even using the

21  circle R.  Everybody's on notice.  And sometimes you see

22  people say Call 1-800-JUSTICE or Dial.  It's used in both

23  ways.  I don't think there's any dispute over that.

24          And my client obviously uses this mark as a

25  trademark.  You know, this 1-800-JUSTICE website, not only

1  does to say it right up at the front with the first -- by the
2  way, you're not required to keep putting R, R, R.  You say it
3  in big front place right up at the front, everybody's on
4  notice.  But it was very interesting, they went straight past
5  the branding section of the website and went straight to how
6  it works.  It can work as a phone number.  But then if you go
7  back to the branding section, if you recall, branding is about
8  your brand name.  It's about a trademark.  There's no --
9  there's no dispute over this.  It's used as a phone number and
10 it's used as a trademark.  It's not just merely licensed as a
11 phone number.  And there was lots of other use.  You recall
12 these YES! faxes.  I mean, right here, "I am interested in
13 800-JUSTICE" circle R.  It's been -- "I'm interested in that
14 trademark."  I mean, certainly not being used as a phone
15 number here at the top of the letterhead.  It's being used as
16 their trademark.  This is our brand name.

17         Same thing with advertisements that are run.  This
18 is being used as a trademark.  On the business cards, on the
19 envelopes, on the subscriber license agreement.  I mean, this
20 is clearly being used by my client and licensees as a
21 trademark, the logo that was developed.  Other licensees, you
22 know, their firm name and 1-800-JUSTICE with the showing that
23 it's a trademark.  These are all uses of trademark.

24         This is another distraction from the case to try to
25 do a look-here.  It's not always used.  It's used as a phone

9

number.  That's the whole purpose of the business, of course
it's used as a phone number.  The Trademark Office approves
phone numbers all the time as trademarks if they're not just
used as a phone number, if they're not just licensed as a
phone number.  It's got to be both.  It's never just the
trademark.  Obviously there's no point in the trademark if
it's not a phone number.

Now, you also heard Mr. Russo's deposition read to
the Court.  I know that the deposition part of this case is
probably the hardest part of the case to sit through.  It's
not easy for me either.  I certainly have seen hours and hours
of that in other cases.  So you guys got off easy.  But this
is talking about some guy in 1992, did he use it for six
months, did he use it for a year.  This is another one of
those distractions.  We got an intent to use application that
that process ends in 2003.  Who cares if Mr. Russo used it or
not.  That's not even part of the important part of this
story.  He's trying to take your eye off the ball on this.

And, again, I fear that he's doing a good job of it
but I'm trying to put things into perspective here and trying
to focus this case on the very narrow issues in this case.

Then there was this distraction:  Wait a minute, you
guys are also doing pro se divorces and mediation services?
That must mean it's not a trademark.  I don't even know what
was going on with that.  Fisher Price makes toys.  That

10

doesn't mean it can't put out DVDs and strollers too. Folks
often expand in related areas to use their trademark. To
suggest that you can't use 1-800-JUSTICE for mediation
services, I don't even know where that came from. You won't
see it anywhere on the instructions. Again, it's a gotcha.
Gotcha on what, I don't know. It's a distraction in this
case.

Now, then you heard a lot of testimony: Did you
approve the ads? How much were you involved in the ads of
your licensees? Did you go over it? Did you make sure this?
So what? The question in when you license something is making
sure you don't sign up a hooligan law firm or something. You
want to make sure that you are signing up a quality law firm.
It has nothing to do with the quality of the advertising.
That's a complete distraction.

You'll see it in your instructions. When you look
at quality of services, it says quality control over the
service that is being offered in connection with the
trademark, not in the quality control over the advertising.
This has come up in numerous cases. People always try to
switch this. I got to tell you, just read the instructions
for yourself.

But my client -- and nobody's ever testified
differently in this case -- when she signs up a law firm, she
makes sure they're a member in good standing with the bar and

Case 3:06-cv-05023-JCE   Document 214   Filed 07/23/09   Page 11 of 28

1  that she also makes sure that there are no disciplinary

2  actions and she follows up with those law firms.  That's about

3  the quality of the service of the law firm, not about the

4  quality of service of the advertising.  This is another

5  distraction to try to confuse you in this case.

6          My favorite distraction in the case, of course, was

7  Singapore.  I have no idea what that has to do with anything.

8  So what that a nonlawyer, that a nonlawyer in this case

9  thought somebody was using a trademark and she got calls from

10 the United States.  So what that she called her lawyer and

11 said, "Can we do anything about this?"  So what?  What is

12 that?  It's another distraction trying to make my client not

13 look credible in this case, trying to give, Oh, you just go

14 after everybody.

15         No, this is about whether Mr. Norinsberg is

16 infringing this trademark.  This isn't about whether she

17 didn't know her rights legally.  Most people who are not

18 lawyers don't understand this stuff.  I think that ranges

19 right up there with how much time you spent in Honduras.

20 These are the kind of issues that they want to distract you

21 away from the case.  "Well, were you working on your business

22 at that time in the 1990s after you got a divorce?  Were you

23 working on that?"  Who cares?  That is an intent to use

24 application filed in 1992 that the Patent and Trademark Office

25 allowed to go through till 2003.

1        This entire case was basically an assault to try to

2 make Mrs. Dobrauc look bad by seeing how many inconsistencies

3 they could come up from 17 years ago, from 15 years ago.  I

4 don't even remember what I did last week.  I mean, you know,

5 the truth of the matter is, people should say they don't know

6 and they shouldn't try to figure it out in their head.  It's

7 very understandable that somebody would not remember in detail

8 everything that they said, frankly, even in 2007, two years

9 ago, let alone 15 years ago.  I mean, that's understandable.

10        And, frankly, I'm not up here telling you that when

11 Mr. Norinsberg looked like I might have caught him in

12 something when he said, "Oh, yeah, I had the website," and

13 then I showed him that he didn't have the website on the

14 stand, you know what, chances are he didn't remember.  Chances

15 are he didn't remember.  Who cares?  This case isn't about

16 that.

17        I mean, I mainly just -- I'm not up here to show

18 that Mr. Norinsberg is a liar.  I'm here to show you, Look,

19 it's real easy to show that people sometimes get it wrong and

20 then they testify differently.  That happens in every case.

21        You saw one of the most appalling letters I've ever

22 seen from a lawyer saying something about, Let's pay Mr. Russo

23 to see if he'll cooperate with us.  You know, this case is not

24 about whether Mr. Martin is a bad lawyer.  The interesting

25 thing, there was never any evidence that Mr. Russo was paid by

13

1  my client, or that Mr. Russo's even been in the picture for
2  the last 16 years.  When I saw that when I was preparing for
3  this case, I was like, Yuck, what kind of lawyer does such a
4  thing?  But that has nothing to do with whether my client owns
5  a valid trademark or whether Mr. Norinsberg is infringing that
6  trademark.  That has to do with Mr. Martin being a bad lawyer.
7  And whether my client fired him or not at the time, again,
8  that's a distraction from this case.  It's a distraction from
9  this case.

10         Then there was this time period spent when Just
11  Enterprises was formed with a father-in-law to -- when the --
12  because a phone company couldn't market the trademark and own
13  the phone number, so they did what the law requires them to do
14  and they set up a separate company.  Tried to make it sound
15  like something sinister was going on and they're trying to
16  follow the law.  Again, this is to try to say, "I don't want
17  you to think about (888) JUSTICE.  I want you to think about
18  things that have nothing to do with this case.  Because if you
19  do that, I win, because I can show all kinds of stuff going on
20  over here."  That is not what this case is about.

21         And the FCC twice looked at their ownership of this
22  case when people try to wrestle away 1-800-JUSTICE.  Twice
23  looked at that and 1-800-JUSTICE came out on top with the FCC.
24  This is another distraction in this case.

25         You also heard Mr. Norinsberg claim that he and his

company never used (888) JUSTICE; he just merely licensed the telephone number.  Well, first of all, that's absurd.  This is his website, (888) JUSTICE right at the top.  He's not using it as a phone number, he's using it to market to lawyers to sign up his licensees.  A, Mr. Norinsberg uses it.  B, his trademark agreement with his licensees -- we went over it, that Section B at the bottom, if you can remember, says, I'm licensing you the phone number and I'm licensing you the trademark.  So he doesn't just merely license a 1-800 number or -- yes, you know, it's interesting.  I've confused 888 and 800, the Judge did it, there are jury instructions, and Mr. Weems did it once in this case.  That's how confusing these trademarks are.

This is another distraction.  Mr. Norinsberg has not just merely licensed the phone number, he's put it in his license agreement that it's a trademark, and he uses it on his website.  And, remember, he even told you about going to a trade show where he tries to sign up.  He uses this trademark.  What is he, not talking about it at all?  Of course he's using it as a trademark.

And then this was -- my favorite distraction is (888) JUSTICE is not a trademark.  Well, he certainly didn't believe that when he filed for an application for (212) JUSTICE, (718) JUSTICE, 800-JUSTICE, (888) JUSTICE, TRIPLE-8 JUSTICE, filing application after application with the Patent

15

and Trademark Office and then get up and tell you, "I don't
think these are trademarks." That is not consistent. He's
filed all of these applications and he's trying to confuse you
into this thinking that despite these years of activity at the
Patent and Trademark Office that, you know what, it doesn't
suit my -- it doesn't suit me for this case right now, so now
it's real convenient that these aren't trademarks. And it's a
distraction. And it's absurd because the Patent and Trademark
Office obviously did not agree with him. You saw how many of
these things that the Patent and Trademark Office let through.

        I could go on with lots of other things here but I
think the point has been clear about what the game plan is
here. It's to throw as many things against the wall as
possible and see if they can convince you to take your eye off
the ball and ignore the other evidence about the real issues
in this case; whether 800-JUSTICE and (888) JUSTICE are
confusingly similar.

        You know, they even try to distract you with this
notion that I misrepresented something in my opening
statements when I said that this survey of Mr. Berger's was
paid $25,000. And then, of course, I pulled out his
deposition when he told me it was 15 to $25,000. I didn't
just make that up. I took it straight out of his deposition.
The fact that it actually came to closer to 15,000, okay, I
don't dispute that. He still was paid a lot. He and his

16

1 companies were paid a lot of money to render an opinion. It's
2 another distraction.

3      Another one of these distractions, I mean, whether
4 Mr. Norinsberg did or didn't try to buy 800-JUSTICE. Who
5 cares? Okay. He didn't. Congratulations. It still doesn't
6 have anything to do with whether you're infringing a
7 trademark.

8      And then this distraction that, oh, 800-JUSTICE, you
9 have no plans, you have no plans whatsoever to take this thing
10 nationwide. I mean, that's -- I can't understand how anybody
11 could conclude when they try to do a marketing plan and then
12 they get -- this FCC stuff comes up. They have a website that
13 specifically goes -- you remember it says for the U.S. This
14 is for the U.S. Talk about a concrete plan, it's in writing.
15 It's marketed to people that way. They signed up a marketing
16 company to try to -- you remember the agreement with them to
17 take this thing nationally. That's about as concrete as you
18 get. A concrete plan doesn't mean you've been successful
19 implementing it yet. It's awful hard to implement things when
20 all your resources are going towards a lawsuit. Again, it was
21 voluntary to file the lawsuit, but it still doesn't mean that
22 the -- just because you have plans that you've been able to
23 take it through yet.

24      I'm going to -- Mr. Norinsberg didn't call me last
25 night on the phone, says, "Here's what I'm going to say during

17

closing arguments," but I can guarantee you 90 percent of his
closing argument is going to be exactly the type of
distractions that I told you about today. That's how
confident I am that he's going to spray liquid and flap his
wings and do all this kind of color-changing stuff so you can
take your eye off the ball. He's not going to get up here and
talk about how confusingly similar these trademarks -- well,
he might now that he's heard me. But you understand what I'm
saying here.

I know you took notes on a lot of these things and I
know you've got to do that. You got to try to get to the
bottom of things. But I want to now talk about the case,
finally, since that's basically what the trial was about was
something other than the case. But let's talk a little bit
about the case.

Is this mark descriptive or suggestive? I think I
admitted to you in opening statement -- I try to be a
reasonable person not only in my personal life but even when
I'm talking here in court. And I told you it was a close
call. I said that. I didn't get up here and say, "We win no
matter what." It wasn't my approach here at all. I think it
is a close call and that we needed to see what the evidence
was going to be in this case. Whether it's descriptive or
generic is not what somebody who's not a lawyer happened to
think about it at some time who doesn't even know what these

18

terms mean.  That's not whether something is descriptive or
suggestive.  Suggestive is -- you've seen the instructions,
but suggestive is some thought is required to come up with it
and descriptive is more of an immediate thing; you know, you
don't really need thought to determine what it is.

Now, I'm sure Mr. Norinsberg is going to cherry-pick
some things out of Mr. McKenna's testimony.  I'll have to do
it on -- I'll get one more chance to talk to you at the end
here if I have to cherry-pick my own parts out of it.  But at
the end of the day, Mr. McKenna called this case a close call.

Now, although Mr. Berger was hired by the
defendants, I would like to posit to you and tell you that I
think that Mr. Berger's survey and his testimony
overwhelmingly supports that this mark is descriptive.  He
went to 250 folks, and after we take out his double-dipping
and how he didn't give consideration to these
why-did-you-say-law, let's just throw that into legal services
and lawyer, oh-you-meant-Judge-Judy, that doesn't describe --
when somebody thinks of 1-800-JUSTICE they think of Judge
Judy, that's not describing my client's services.  Whether it
was him or his company -- they got very cute with this.  But
when you take all that stuff out and actually do an honest
interpretation, you get similar to my calculation, somewhere
57 percent of respondents did not automatically go to lawyer
services when they think of 1-800-JUSTICE.  They thought of

1  Justice Department and they thought of -- oh, the I-don't-know

2  opinions don't count.  Come on.  I mean, that's the whole

3  point of this, to determine what do you think.  You know, I

4  don't know what I think, which means they don't automatically

5  think of lawyer services.

6          I think Mr. Berger's testimony -- and for Mr. Berger

7  to even say that his conclusion was it's descriptive, he

8  couldn't -- his definition of descriptive, he couldn't come up

9  with one.  He said Dollar Store.  I don't -- regardless of

10 Mr. Berger's opinion, the evidence that he -- the survey

11 evidence that he brought into this case I think supports very

12 overwhelmingly that in fact this mark is suggestive.

13         And, you know, it's not just the survey evidence,

14 though, that I think supports that this mark is descriptive.

15 I know Mr. Norinsberg is a good testifier -- he's a lawyer, I

16 wouldn't expect anything less -- but the truth is, his actions

17 out of court show that he also thought this mark was

18 descriptive -- I mean suggestive.  He filed five applications,

19 each time claiming that he had trademark rights.  He didn't

20 file those applications thinking he didn't have trademark

21 rights.  He thought he did.

22         But even more than Mr. Norinsberg -- and I think

23 what's so important in this case is that the Patent and

24 Trademark Office consistently and overwhelmingly has

25 determined over and over and over again that 800-JUSTICE,

20

(888) JUSTICE, (212) JUSTICE, (718) JUSTICE, TRIPLE-8 JUSTICE
are not descriptive.  The Patent and Trademark Office, the
experts in the field, the lawyers who looked at these, they
didn't just do it once.  You could understand if somebody made
a -- two people made a mistake once or twice, but it wasn't
just those five people.  Simple Justice, Power of Justice, You
Have a Right to Justice, Justice for All, Justice for the
Injured for Lawyers, Secret Justice.  So now we're up to 12
different examiners at the Patent and Trademark Office, none
of whom determined that this trademark was descriptive.  The
defendants basically want you to think that the PTO, the
Patent and Trademark Office, got it wrong 12 different times.

         Now, I told you Mr. McKenna said this case is a
close call.  Well, Mr. McKenna wasn't here to hear
Mr. Berger's survey evidence which might impact his opinion.
He did say when there is maybe an equal force between, you
know, is it descriptive, is it not descriptive, the Court
should not overrule the action of the Patent Office to whose
care Congress has entrusted the preliminary determination as
to whether a mark fulfills the requirements of the statute.
In other words, when it's a close call, we're just going to
ignore the Patent and Trademark Office?

         Again, I'm not unreasonable.  There are obviously
people that hear 1-800-JUSTICE and think of law firms.  There
might even be a few of you that thought of law firms.  That's

Case 3:06-cv-05023-JCE   Document 214   Filed 07/23/09   Page 21 of 28

1  not what the evidence in this case is in terms of what level

2  do you need to get at for a term to be considered descriptive.

3  The answer isn't, you know, if 33 percent or 43 percent -- my

4  math -- 43 percent say it's lawyer service and 57 percent say

5  that it's not lawyer services, that doesn't mean it's

6  descriptive.  In fact, that means over a majority of people

7  don't think it's descriptive.

8          Now, the other issue in this case is whether (888)

9  JUSTICE and 800-JUSTICE are confusingly similar.  And

10  Mr. Norinsberg admitted on the stand, I don't think there's

11  been much of a debate here that these are confusingly similar

12  marks.  But it's an important issue in the case because the

13  two issues you need to decide are is this a valid trademark,

14  is this a suggestive trademark, and, two, is there

15  infringement going on?  In other words, are these confusingly

16  similar trademarks?  We can talk about the four calls from

17  Hawaii, but the bulk of the calls that came into 1-800-JUSTICE

18  from states in which Mr. Norinsberg has licensees, that's

19  where the numerous, numerous calls come in.  You heard people

20  asking for his licensee law firms on the phone.  If that isn't

21  confusion, I don't know what is.

22          I'm asking you to determine in this case that

23  1-800-JUSTICE is suggestive.  That's what I'm asking you to do

24  in this case.  I'm asking you to ignore the distractions and

25  I'm asking you to determine what I believe the evidence has

22

shown in this case. And then I'm asking you to award
something that I think is fair. It's not my -- some lawyers
will get out there and say, "You should give $2 million." You
know, you hear these things on television, people spilling
coffee and getting all kinds of millions of dollars. I
started drinking coffee at McDonald's hoping maybe that I'd
get -- but the truth is, I'm not asking you to get crazy here.
I'm just asking you to be fair. The only numbers that were
really involved in this case was the $37,000 that my client
had to spend fielding these calls primarily for
Mr. Norinsberg. There was some testimony about because of
the -- because of the two marks being in Alabama, $155,000 in
less profits that my client would have to get in Alabama. And
then Mr. Norinsberg testified that he generated roughly
$100,000 of his own.

     Now, you'll see on the instructions it's my burden
on Mr. Norinsberg's profits to come up with what the revenue
is and that Mr. Norinsberg has the burden to come up with the
specific expenses to see -- and Mr. Norinsberg didn't do that,
so I don't really know what amount of that $100,000 is fair,
but I leave it to you just to be fair. Those are the three
kind of different numbers here. I'm asking you to award some
type of damages against Mr. Norinsberg and his company for the
infringement that's gone on in this case and for the confusion
that's being caused in this case. (888) JUSTICE clearly

Case 3:06-cv-05023-JCE   Document 214   Filed 07/23/09   Page 23 of 28

1    infringes 1-800-JUSTICE.

2            I thank you again for the time.  I know this has

3    been a long week for you all.  I might get a few more minutes

4    to speak to you after Mr. Norinsberg is done.  Thank you.

5            (Closing argument of Mr. Norinsberg.)

6            MR. KASS:  I only have 12 minutes, so there's a lot

7    to cover.

8            You know, Mr. Norinsberg mentioned -- well, first of

9    all, I think you saw a lot of the stuff that I said was going

10   to happen.  Why was Mr. Martin hired?  Even though they took

11   his deposition for four hours, why is -- and he asked him

12   every question under the planet, why isn't Mr. Tafty here?

13   This is another distraction.  This is about whether this case

14   is a suggestive trademark or not.

15           Mrs. Dobrauc is the cofounder to this company.

16   She's the one who started this company and she's involved in

17   this company day-to-day.  It's not like there's no important

18   person here on behalf of the company.  They got to ask them

19   questions.

20           Also completely kind of twisted Mr. McKenna's words

21   around, the stuff that Mr. McKenna was talking about when

22   asked, "Do you agree or disagree with that?"  "I disagree with

23   it," that's what he says.  And then when he's asked, "Is it

24   fair to say as far as consumer goes that the mark

25   1-800-JUSTICE is descriptive?"  "That's not the conclusion

24

that I drew.  And, you know, I think you'd want to see a
survey."  Well, of course there's no survey done.
Mr. Berger's survey was sufficient to prove that this is not a
descriptive trademark.  Don't take my word for it or
Mr. Norinsberg's word for it.  I want you to just use your
common sense like Mr. Norinsberg said.

        And the whole point about whether it's suggestive or
descriptive is what do consumers think, not does what does
Mr. Tafty think in a deposition, not what did he tell his
lawyers.  That's not how a mark is determined descriptive.
The mark is determined descriptive what do consumers think,
what does the Patent and Trademark Office think.  These are
distractions.

        And Mr. McKenna saying that he thought -- he could
think of -- you could think of something related to law when
you hear 1-800-JUSTICE.  They didn't quote the parts where he
says that could be the court reporter, that could be the
courts.  That's the whole point of this.  That's the whole
point of this.

        The only instruction you're going to get in this
case regarding 1-800 numbers is specifically this, and you've
heard it:  Is there just a mere licensing of the phone number
or is it used as a trademark?  There's plenty of evidence.  He
addressed the evidence when it's used as a phone number.  And
you remember the television commercials that I played for you

Case 3:06-cv-05023-JCE   Document 214   Filed 07/23/09   Page 25 of 28

in court and you remember what I held up for you here just now. You've seen some of both. So it is used as both. There's no -- it's not only used as a phone number. And I think to say that just ignores the evidence.

Then this issue of abandonment. We discussed it so I'm not going to belabor the point but, again, this was an intent to use application. The FCC is determining whether they have a right to this phone number or not. He spent most of his time talking about evidence in the 1990s. He spent zero time talking about evidence in the 2003-plus period. I think that's telling.

I also think it's telling that in 45 minutes he mentioned (888) JUSTICE once. Once. Because that is trying to get you away from looking at the exact trademark that's the problem here. And, frankly, even if you were to get into these use issues, my client had 800-JUSTICE in 2003, a registration. He didn't buy (888) JUSTICE until 2004.

Mr. McKenna never even addressed the issue in his report or in his deposition, he wasn't even asked to, about what my client's plans were or were not plans to use this on a national basis. So when he talks about, you know, they've only used it in Springfield and this and they've only licensed it to these areas, that wasn't part of Mr. McKenna's charge.

I want to go back to what I said at the beginning, which is I want to try to focus this case. This case is about

whether this is a suggestive or descriptive trademark.  It's
not about bad lawyers, it's not about who you did or you
didn't hire as an expert, it's not about Honduras, it's not
about whether in the 1990s you had FCC issues yet there's an
intent to use application.  Again, he used the term intent to
use application once in his entire 45 minutes, avoiding the
real issues in this case.

I know this is a tough case.  I know you've heard
things going back and forth.  I'm asking you to do the fair
thing.  I also don't know what you're going to do.  I don't
presume to know what's even in your head right now.  But I'm
asking you, I'm pleading with you to try to think about what's
really important in this case and what is trying to be used as
a distraction.

I really, really appreciate the time that you've
given to us on behalf of both sides of the case.  Again, it's
a -- we're fortunate to live in a country where we have an
opportunity to resolve our differences in this way.  So I know
you'll be conscientious and look at things, but I'm asking you
to focus on the crux of this case.

Thank you so much.

*   *   *   *   *   *

27

<u>CERTIFICATE</u>

1

2    I certify that the foregoing is a correct

3    transcript from the record of proceedings in the above-entitled

4    matter.

5

6

7

8

9

10  _____        _____

11         Date                Jeannine M. Rankin, CCR, CSR, RPR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28